FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.

★ JUN 29 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,

v.

98 CR 860 (SJ)

MEMORANDUM
AND ORDER

JAMES JOHNSON,

       Defendant.

------------------------------------------------------X

A P P E A R A N C E S

BENTON CAMPBELL, ESQ.
United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201
By:    Berit Berger

FEDERAL DEFENDERS OF NEW YORK
One Pierrepont Plaza
16th Floor
Brooklyn, NY 11201
By:    Diedre von Dornum

JOHNSON, Senior District Judge:

      Following a jury trial before District Judge Edward R. Korman, defendant James Johnson ("Defendant" or "Johnson") was convicted and sentenced principally to a term of thirty years for his commission of four Hobbs Act felonies:

1

robbery conspiracy, robbery, use of a firearm to commit robbery, and murder in the commission of a robbery. In sentencing Defendant to thirty years, Judge Korman downwardly departed from the United States Sentencing Guidelines, under which Defendant's recommended sentence was life imprisonment. Specifically, Judge Korman determined that the United States Sentencing Guidelines § 2A1.1 Application Note 2(B) ("Application Note 2(B)") warranted a reduction primarily on account of Defendant's age at the time of the robbery and the brevity of his criminal behavior. On February 19, 2003, Defendant's conviction was overturned by the Second Circuit pursuant to Batson v. Kentucky, 476 U.S. 79 (1986).

The case came before the undersigned for retrial in January 2004. Defendant was again convicted of all charges brought against him in the superseding indictment, and with regard to the felony murder charge, received a life sentence, as this Court found inapplicable the downward departure defined in Application Note 2(B). Defendant again appealed his conviction, which was granted, pursuant to United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), for consideration of resentencing. Defendant was resentenced to life and that sentence was vacated by the Second Circuit on April 15, 2008. This Court permitted defense counsel the opportunity to submit additional briefing on the issue of whether a downward departure pursuant to Application Note 2(B) was warranted.

Based on the submissions of the parties, the factors enumerated in 18 U.S.C.§ 3553(a), and for the reasons stated below, the Court hereby VACATES its

P-049

September 19, 2008 order and resentences Defendant to a term of life imprisonment for Count Eleven of the superseding indictment.

## BACKGROUND

In late 1997 and early 1998, Defendant was a member of a group who referred to themselves as "Criminals Getting Paid," or "CGP." Different members of the group committed different robberies, orchestrated by co-defendant Ozem Thomas ("Thomas"), in the East Flatbush section of Brooklyn on a semi-daily basis for a period of approximately two months. One of these robberies occurred on February 12, 1998. It was then that Defendant, with others, robbed the New Clarkson Luncheonette located at Clarkson and Albany Avenues. In the course of that robbery, Defendant held a .380 caliber firearm to the head of an employee of the luncheonette, while his co-defendants searched the register and lotto machine for money. When Defendant and his companions fled the scene, the proprietor of the New Clarkson Luncheonette, Mohammed Elbassiony ("Elbassiony"), gave chase. Khasim Marcelle ("Marcelle"), one of Defendant's co-conspirators, testified that Defendant asked him whether Elbassiony was armed. Marcelle testified that he could not determine whether Elbassiony had a gun and told Defendant he did not know. Defendant then told Marcelle "I'm gonna bust him," to which Marcelle replied "I don't care. Bust him. Shoot him." Defendant shot Elbassiony, who was hit in the stomach and died twelve days later.

3

Marcelle also testified that after the robbery, the group gathered at the Congregation of the House of Israel on Clarkson Avenue, where they drank beer and smoked marijuana. Marcelle testified that, following the robbery, Johnson's demeanor was "smooth" as he explained that he learned to shoot at the range with his mother.

Michael Hylton, a friend of Defendant's, testified that Defendant told him about shooting Elbassiony, saying he "was down with it, but it was nothing." Kevin Bell ("Bell"), another friend of the CGP group, testified that Johnson said that he "had to shoot" Elbassiony. Bell also testified that Marcelle, who, after the robbery of the New Clarkson Luncheonette, was imprisoned on unrelated drug charges, wrote a letter to Bell asking him to inform Thomas, co-defendant and primary organizer of the robberies, that Marcelle knew additional "spots" (businesses or locations) that could be robbed.

On May 27, 1999, Defendant received a phone call from another CGP member, Carvin Loussaint ("Loussaint"), who, along with others, had already been apprehended for the instant offenses and who, at the time, was in custody at the Metropolitan Detention Center. During the conversation, Loussaint warned Defendant that federal agents had mentioned his name and that Loussaint suspected Marcelle of cooperating with authorities. Johnson insisted that he was not worried. Johnson told Loussaint that Marcelle is "gonna be dead" because Johnson is "connected." (See, e.g., Govt's Ex. 31 at 6-7 ("When lot of niggers end up

4

P-049

missing, you'll see what I'm talking about. . . .[N]iggers wanna call my name, put me in some bullshit. They gonna see. They gonna find out the hard way.").) Loussaint warned Defendant to flee the jurisdiction because authorities had his photograph and could apprehend him, but Defendant responded, "I ain't worried."

Defendant was thereafter arrested, on June 9, 1999.

## DISCUSSION

Under 18 U.S.C. § 3553(a) ("Section 3553(a)"), certain factors must be considered by the District Court when sentencing a defendant. The Court has considered all of the factors in Section 3553(a) and will hereinafter explain those found most pertinent in fashioning Defendant's sentence.

*Nature and Circumstances of the Offense and the Characteristics of the Defendant*

Section 3553(a)(1) requires the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." In this case, Defendant was a member of an organization called "Criminals Getting Paid" who functioned to rob area businesses and their clients. After the robberies, members of CGP would often hide out in a religious establishment where they would divide the proceeds, which were used to purchase alcohol or drugs or to party.

5

P-049

While the order issued by the Second Circuit indicates that Defendant had no criminal history prior to this crime spree, the Pre-Sentence Investigation Report prepared following his second trial reveals that, at the time of the robbery of the New Clarkson Luncheonette, he was on probation for an incident in which he, along with nine others, surrounded and robbed a 15 year-old of his hat, backpack, jacket and money. The victim told police that Defendant had a box cutter during the offense. This information did not appear in the Pre-Sentence Investigation Report prepared after his initial conviction, nor was this information brought to the attention of the original sentencing court. Defendant was also arrested on November 24, 1995, and charged with robbery and another assault.

*Objectives of Punishment*

Section 3553(a)(2) requires that a sentence "reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense." In this case, the offense is murder, among the most serious of crimes. It is noteworthy that Defendant showed little remorse for his actions, claiming he was "down with" the robbery, and that it "was nothing," and boasted of his ability to seek revenge on anyone who cooperated with the government.

As the name implies, the "Criminals Getting Paid" enterprise conspired to profit by way of robbery, and evidence at trial indicated that members showed interest in continuing to do so even after the New Clarkson Luncheonette robbery.

6

P-049

These actions bear directly on the need for Defendant's sentence to instill a sense of respect for the law and the need to adequately punish his actions in light of his unrepentant attitude.

*Application Note 2(B)*

Although Defendant's guideline sentence for Count Eleven is life imprisonment, he asks that the Court downwardly depart from this sentence, pursuant to Application Note 2(B). This note provides, in relevant part:

> [i]f the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. For example, a downward departure may be warranted if in robbing a bank, the defendant merely passed a note to the teller, as a result of which the teller had a heart attack and died. The extent of the departure should be based upon the defendant's state of mind (e.g., reckless or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct.

U.S.S.G. § 2A1.1 Application Note 2(B). However, as explained herein, Defendant's conduct was not akin to that of a bank robber merely passing a threatening note to a sensitive teller, or to someone who accidentally or negligently discharges a firearm. Defendant intended to shoot, and intended to shoot Elbassiony specifically. After the shooting, Defendant boasted that he was a good shot.

Moreover, the risk of an employee being killed is inherent in both the decision to commit armed robbery of a business establishment and the decision to

7

P-049

discharge a firearm while doing so. Thus, this Court declines to downwardly depart pursuant to Application Note 2(B).

## CONCLUSION

For these reasons, the Court finds that the factors enumerated in Section 3553(a) warrant its adherence to the original sentence of life imprisonment on Count Eleven.

SO ORDERED.

DATED: June 18, 2009
       Brooklyn, New York

/s/(SJ)
_____
Sterling Johnson, Jr., U.S.D.J.

P-049